UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------   x

BENJAMIN QUINONES and ASHLEY RAMIREZ as Co-
Administrators of the Estate of P.Q., Deceased; Ashley
Ramirez, Individually and Benjamin Quinones, Individually,

                        Plaintiffs,

                -against-

The CITY OF NEW YORK, New York City Administration
For Children's Services, GLADYS CARREON, as a
Commissioner, JACQUELINE MCKNIGHT, as a
Commissioner, WILLIAM FLETCHER, individually and as
First Deputy Director, SOPHIA SMITH-JAMES, individually
and as a caseworker, AIDA TORRES individually and as a
supervisor, SHEMROY HAYNES individually and as
supervisor, JOHN DOE 1-5, individually and as ACS
supervisors, JOHN ROE 1-5, individually and as ACS case
workers,

                      Defendants.

-----------------------------------------------------------------   x

**COMPLAINT**

Jury Trial Demanded

        Plaintiffs Benjamin Quinones and Ashley Ramirez, individually and as legal

administrators of the Estate of P.Q., by and through their attorneys Robert Marinelli, Esq., and

Abraham George, Esq, allege as follows:

<u>PRELIMINARY STATEMENT</u>

        1.       This is a civil rights action in which infant plaintiff seeks damages to

redress the deprivation, under color of state law, of rights secured to him under the Eighth and

Fourteenth Amendment to the United States Constitution.  Infant plaintiff also appends state law

claims.  While placed in the care, custody and control of defendants, infant plaintiff was

subjected to repeated and severe physical abuse, torture, and neglect, ultimately resulting in his

death.  This is an action against the City of New York, The City of New York Administration for

Children's Services, and various officials and employees who unlawfully placed him in an

abusive home, and failed to protect him from abuse.

JURISDICTION AND VENUE

2.      Jurisdiction is conferred on this Court by 28 U.S.C. §1343(3) and (4), which provide for original jurisdiction in this court of all suits brought pursuant to 42 U.S.C. §1983, and by 28 U.S.C. §1331, which provides jurisdiction over all cases brought pursuant to the Constitution and laws of the United States.  In addition, this Court has pendent jurisdiction over infant plaintiff's state law claims and over certain defendants pursuant to 28 U.S.C. § 1367.

3.      Venue is proper because all or substantially all of the events giving rise to the present action occurred within the Southern District of New York.  28 U.S.C. § 1391(b).

PARTIES

4.      Benjamin Quinones ("Benjamin") and Ashley Ramirez ("Ashley") were appointed administrators of P.Q.'s estate by Order of the Probate Court Bronx County on March 17, 2015 for the purposes of commencing this action.  The Administrators bring suit in their capacity as administrators for the estate of P.Q.

5.      Defendant City of New York (the "City") is a municipality organized and existing under the laws of the State of New York. At all times relevant hereto, the City, acting through the New York City Administration for Children's Services ("ACS"), was responsible for the practice, supervision, implementation, and conduct of all ACS matters and was responsible for the appointment, training, supervision, and conduct of all ACS personnel. In addition, at all relevant times, the City was responsible for enforcing all ACS rules, regulations and policies.

6.      Defendant Administration for Children Services (ACS) is the City agency charged with the responsibility of protecting the City's children from abuse and neglect.

7.      Defendant City assigned the defendant ACS to supervise the placement of infant plaintiff  at the time of his death.

8.      Gladys Carrion ("Carrion") has been Commissioner of ACS, since her

appointment in December 2013.

9.      Carrion was responsible for making, implementing and supervising the policies and practices of defendant ACS as well as supervising defendants, including regarding the placement of infant plaintiff.

10.      In August 2014, Jacqueline McKnight ("McKnight') was named Executive Deputy Commissioner of Child Welfare Programs. In this role McKnight oversees oversaw all of ACS' child welfare programs and services.

11.      From October of 2012 through August of 2014 McKnight was Deputy Commissioner in the Division of Family Support Services. In this role she oversaw all of ACS' child preventive care services.

12.      McKnight was responsible for making, implementing and supervising the policies and practices of defendant ACS as well as supervising defendants, including regarding the placement of infant plaintiff.

13.      In August 2014, William Fletcher ("Fletcher') was named Deputy Commissioner of Child Protection. In this role Fletcher oversees all of ACS' child protective services.

14.      Upon information and belief, defendant Fletcher was responsible for making, implementing and supervising the policies and practices of defendant ACS as well as supervising defendants, including regarding the placement of infant plaintiff.

15.      As Commissioners of ACS, defendants Carrion, McKnight and Fletcher created and/or approved policies governing ACS, including policies regarding the care, supervision, and protection of children placed in foster care, the supervision of foster care agencies, and the training and supervision of employees.

16.      As Commissioners, defendants Carrion, McKnight and Fletcher were responsible for ACS's compliance with the constitutions, laws, and regulations of the United

States and the State of New York. Collectively they are the "Commissioner Defendants."

17.     Defendant Aida Torres "Torres" and Shemroy Haynes "Haynes" were employed by defendant ACS as a supervisors during the period of P.Q.'s placement.

18.     Upon information and belief, defendant John Does 1 – 5 were employed by the defendant City of New York as supervisors during the period of P.Q.'s placement with ACS.

19.     Collectively Torres, Haynes and Does are the "Supervisor Defendants."

20.     Defendant Sophia Smith-James was employed by defendant ACS as a caseworker during the period of P.Q.'s placement.

21.     Defendants John Roe 1-5 were employed by defendant ACS as caseworkers during the period of P.Q.'s placement.

22.     Collectively Smith-James and Roes are the "Caseworker Defendants.

23.     Upon information and belief, Supervisor Defendants were assigned by defendant City, ACS, and Commissioner Defendants to supervise and/or monitor infant plaintiff and Caseworker Defendants.

## NOTICE OF CLAIM

24.     On or about November 25, 2014 with respect to plaintiff's claims arising under state law, a Notice of Claim was duly and timely served on the Comptroller of the City of New York.

25.     At least thirty (30) days have elapsed since the Notice of Claim was served, and defendant City has neglected and/or refused to make adjustment, settlement or payment with respect to the injuries complained of.

26.     This complaint is served within one (1) year and ninety (90) days of the date of the incident.

FACTS

27.     On March 2, 2011 Ashley gave birth to a son, P.Q. Benjamin was his father.

28.     Ashley had a previous child, Y.R., born September 26, 2009.

29.     As ACS was aware, Benjamin was born into a deeply troubled home. His mother Madeline Yensi ("Madeline") was married to a perverted, violent and abusive man. This man was not Benjamin's natural father.

30.     ACS was aware, that this man severely abused a child in his home and Madeline failed to protect this child.

31.     The Family Court made a finding that Madeline was neglectful in failing to protect this child. ACS prosecuted the case against Madeline.

32.     In November 2011, ACS began supervising the home of Benjamin and Ashley. They believed that Benjamin and Ashley's home was disorderly and that caring for P.Q. and Y.R. might be too much for the young couple to handle.

33.     Benjamin and Ashley had little money and difficulty adjusting to the strains of parenthood.

34.     In March, 2012, P.Q. and Y.R. were removed from Benjamin and Ashley's care and placed in a home under the supervision of ACS.

35.     In early April, 2012 Benjamin and Ashley requested a hearing pursuant to Family Court Act § 1028 (a "1028 hearing").

36.     At a 1028 hearing, a Family Court Judge, after hearing sworn testimony, decides whether the subject children would be in imminent risk of harm if they were returned to the care of their parents.

37.     On April 3, 2012 the Family Court Judge determined that returning P.Q. and Y.R. to Benjamin and Ashley did not place the children in "imminent risk" and released

5

them to Benjamin and Ashley.

38.     During the course of the next two years, via the direction of ACS, P.Q. and Y.R. lived in multiple homes, sometimes with one or both of their parents, at other times in foster care or with relatives; all under the auspices of ACS.

39.     On September 11, 2013, Madeline Yensi, Benjamin's mother, offered herself as a resource to care for the children.

40.     Upon information and belief, due to her past inability to protect children in her home, and founded neglect cases against her, Madeline's home was rejected as an appropriate place for the children.

41.     On April 29, 2014, Benjamin requested another 1028 hearing requesting that the children be placed in his care.

42.     At the conclusion of this hearing, the Family Court Judge ordered the children placed back in Benjamin's care.

43.     The difficulties of the shelter system, poverty and youth made it difficult for Benjamin to take proper care of P.Q. and Y.R., and they were again removed from his care.

44.     Upon leaving Benjamin's care, ACS progress notes described P.Q. as "a friendly three year old…active and alert. He has a caramel complexion, dark brown eyes and his hair is cut very short. He physically looks his stated age. P.Q. is talkative, his speech is clear. He is not shy, there are no issues with engagement."

45.     When P.Q. was removed from Benjamin's care, he was a thriving, delightful and healthy boy.

46.     On or about September 20, 2014, ACS placed P.Q. in Madeline's home. Madeline was now married to a new man, Fernando Yensi ("Fernando").

47.     ACS knew that Fernando had a history of extreme and sadistic domestic violence within Madeline's home.

6

48.     On September 23, 2014 caseworker Sophia James-Smith went to the Madeline's home to discuss her "concerns" about Madeline's past parenting inadequacies.

49.     When Madeline told Ms. James-Smith that P.Q. was "happy" living with her, Ms. James-Smith was satisfied and allowed P.Q. to remain.

50.     ACS, Supervisor Defendants and Caseworkers Defendants, ignored prior reports declaring that Madeline was an unfit caregiver and did not perform an updated home study on Madeline and Fernando's home.

51.     Ashley, aware of the history of violence and abuse in Madeline's home, begged ACS to place P.Q. in a foster home. Ashley knew that P.Q.'s placement in Madeline's home was fatally dangerous.

52.     On October 6, 2014, upon ACS's suggestion and approval, P.Q. was officially released to live in the home of Madeline and Fernando.

53.     After an October 22, 2014 court appearance, Ashley again told defendant Smith-James that P.Q. was not safe in Madeline's home and again begged her to move P.Q. to a safe home.

54.     On or shortly after October 22, 2014, Ashley spoke with Haynes, who portrayed himself to be Ms. James-Smith's supervisor, and told him that PQ was not safe in the home of Madeline and Fernando and that PQ should be moved to foster care.

55.     On or shortly after October 22, 2014, Ashley called the ACS hotline and informed them that PQ was not safe in the home of Madeline and Fernando.

56.     Ashley's aunt, Julie Berner, told an ACS caseworker that P.Q. was not safe with Madeline and asked that P.Q. be placed in a safe home.

57.     Ashley's father, Oscar Ramirez, called ACS and asked that P.Q. be removed from Madeline's care and placed in a safe home.

58.     ACS, aware of Fernando's history of domestic violence and Madeline's

7

proven inability to protect children in her home, ignored these pleas and allowed P.Q. to remain in Madeline and Fernando's home.

59.     Photos taken of P.Q. on or about October 31, 2014 revealed a severely swollen and cut right eye.

60.     Upon information and belief, reports of this injury and were reported to the ACS hotline, as well as to caseworker Smith-James.

61.     Despite these reports, Caseworker Smith-James did not make a personal visit to Madeline and Fernando's home until November 10, 2014.

62.     At this visit, Smith-James claims to have checked P.Q. for physical injuries and observed no unusual markings.

63.     There was, however, a "cut" over P.Q.'s right eye.

64.     Defendant Smith-James accepted Madeline's claim that P.Q. was hurt when he "fell in the bath" and made no further inquiry and took no further action.

65.     Madeline told Smith-James that she called ACS immediately after P.Q.'s "fall". There is no evidence that Madeline ever made this call.

66.     If this call was made, ACS did not follow up with a home visit to Madeline and Fernando's home.

67.     Caseworker Smith-James accepted Madeline's claim that any negative reports that were received by ACS originated with Ashley and her family, solely for spiteful purposes.

68.     At this visit, defendant Smith-James learned that Fernando was the caretaker for P.Q. each weekend evening as Madeline worked.

69.     Despite Ms. Smith-Walker's knowledge that Fernando was prone to extreme levels of domestic violence, she made no effort to observe P.Q. interacting with Fernando and expressed no concerns about his babysitting.

8

70.     On November 10, 2014, defendant Smith-James wrote a report detailing her visit.

71.     This report was reviewed ACS Supervisor Defendants.

72.     Despite the red flags raised by this visit, Supervisor Defendants made no inquiry and took no action.

73.     On November 16, 2014, while in the care of Fernando, P.Q. was found dead.

74.     An autopsy revealed trauma to P.Q.'s midsection and stomach. There was also evidence of multiple injuries above P.Q.'s hairline.

75.     Fernando has been charged with P.Q.'s murder and is currently being held on Rikers Island without bail.

                    ACS's RESPONSIBILITIES IN THIS MATTER

76.     Children in foster care in the City of New York are in the legal custody of the Commissioner of ACS (currently, Defendant Carrion). At all times while in foster care, ACS maintained legal custody and legal responsibility for P.Q.

77.     Pursuant to its Charter, the City of New York and Defendant Carrion, as Commissioner of ACS, are responsible for ensuring that ACS complies with federal and state law.

78.     Pursuant to the Constitution, and federal and state law, ACS, while P.Q. was in foster care, was required to and failed to:

                    a.  Protect P.Q. from physical psychological and emotional well-being, U.S. Const. amend. XIV;

                    b.  Provide P.Q. the services necessary to ensure his or her physical, psychological and emotional well-being, U.S. Const. amend. XIV;

9

c.  Provide P.Q. treatment and care consistent with the purpose and assumptions of custody, U.S. Const. amend. XIV;

d.  Place P.Q. in a foster placement that conformed to national recommended professional standards, 42 U.S.C. § 671 (a)(10);

e.  Provide P.Q. with foster care quality services to protect his safety and health, 42 U.S.C. § 671 (a)(22);

f.  Place P.Q. in a foster placement that met standards for continuity and appropriate level of placement, N.Y. Comp. Codes R. and Regs. Tit. 18, §430.12 and 431.19.

## ACS SYSTEMIC FAILURE TO PROTECT CHILDREN IN IN THEIR CUSTODY FROM MALTREATMENT

79.  Maltreatment of children in foster care is a significant problem in New York City.

80.  New York City currently accounts for almost 60% of children in foster care in New York State, which lags far behind the nation with respect to the protection of children in foster care.

81.  Based on the most recent federal data available, New York State ranks 46th out of 48 states and territories for instances of substantiated or indicated maltreatment of children while in foster care. Put simply, children in New York are more likely to be harmed while under the state's protection than virtually every other state.

82.  New York has had a high rate of maltreatment in foster care for years. In both 2002 and 2009 CFSRs, the federal government found that New York did not meet the national standard for the rate of maltreatment in foster care. Based on the most recent federal data available, New York State did not meet the national standard for 2013.

10

83.     Upon information and belief, the high rate of maltreatment in care in New York is driven by maltreatment of children in ACS custody in New York City, which accounts for the majority of children in foster care in the state.

84.     All investigations of maltreatment, including those pertaining to children in foster care custody, begin with a call to the Statewide Central Registry of Child Abuse and Maltreatment ("SCR"). According to ACS, in 2014, SCR received 1,987 reports of maltreatment of children in ACS custody. ACS's Office of special investigation investigates reports of maltreatment, including those in foster care; a report of maltreatment is "substantiated" when sufficient evidence is found to support a determination that a child was in fact maltreated. Of the 1,987 reports of maltreatment in foster care received in 2014, 28% were substantiated.

85.     The high rate of children in ACS custody is a direct result od Defendants' long-standing and well-documented actions and inactions and Defendants' failure to remedy structure and systemic deficiencies that have plagued New York City's foster care system for years. ACS's failure to ensure that foster children are protected from maltreatment substantially departs from accepted professional judgment and demonstrates a deliberate indifference to the risk of harm to foster children, including P.Q.

### FIRST CAUSE OF ACTION
(STATE LAW CLAIM OF NEGLIGENT SUPERVISION –
AGAINST ALL DEFENDANTS)

86.     Plaintiff repeats and re-alleges the foregoing.

87.     When defendants were ordered by the Family Court to supervise P.Q.'s home as a condition to of Poseidon's parole to Madeline's home, Defendants entered into a special relationship with P.Q. that imposed upon Defendants an affirmative duty to care for and protect P.Q.

11

88.     Defendants assumed, through their promises, obligations and actions, an affirmative obligation on behalf of P.Q. when they undertook to supervise his home as a condition of his parole to Madeline's care.

89.     Defendants engaged in direct contact with P.Q., Madeline and Madeline's home.

90.     P.Q., his statutory distributees, the Family Court, and the State in its role as parens patriae reasonable and justifiably relied on Defendants' affirmative undertaking of their duty and responsibility to care for P.Q. and ensure his well being.

91.     Defendants had overwhelming evidence that Madeline's home was not safe for P.Q. and that P.Q. was at imminent risk of serious bodily harm. Defendants, nonetheless did nothing to protect P.Q. from such harm.

92.     Defendants' abdication of their responsibility to and for P.Q. was grossly negligent and the result of deliberate indifference to P.Q.'s health and well-being.

93.     The City, ACS, Commissioner Defendants, Supervisory Defendants and the Caseworker Defendants were grossly negligent and deliberately indifferent to P.Q.'s health and well-being with respect to their supervision of Madeline's home.

94.     The City, ACS, Commissioner Defendants, and Supervisory Defendants were grossly negligent and deliberately indifferent to P.Q.'s health and well-being with respect to their grossly negligent hiring, training, and supervising of the Case Worker Defendants.

95.     But for Defendants' grossly negligent and deliberately indifferent acts and omissions, P.Q. would not have been repeatedly beaten, attacked and ultimately, killed.

96.     It was reasonably foreseeable that Defendants' grossly negligent and deliberately indifferent acts and omissions would proximately cause P.Q. serious bodily harm.

97.     Defendants' grossly negligent and deliberately indifferent acts and omissions proximately caused P.Q. to sustain grievous and fatal injuries and to endure severe

12

conscious pain and suffering.

98.     By virtue of the foregoing, Plaintiff hereby claims damages on behalf of P.Q.'s estate in an amount to be determined at trial.

## SECOND CAUSE OF ACTION
### (42 U.S.C. § 1983- SUBSTANTIVE DUE PROCESS – AGAINST ALL DEFENDANTS)

99.     Plaintiffs repeat and re-allege the foregoing.

100.    When defendants were ordered by the Family Court to supervise P.Q.'s foster home as a condition of P.Q.'s parole to Madeline's custody, defendants entered into a special relationship with P.Q. that imposed upon defendants an affirmative duty to care for and protect P.Q. under the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

101.    Defendants breached that duty. Defendants actions and omissions were a substantial departure from the exercise of reasonable professional judgment, practice, and standards, were grossly negligent, and amounted to a deliberate indifference to P.Q.'s health and welfare.

102.    Defendants acted with deliberate indifference to and callous disregard of repeated and clear indications and signs that P.Q. was placed in the home of a woman unable to provide adequate protection and a man who posed an imminent threat to P.Q.'s health and welfare.

103.    Defendants failed to ensure the safety and wellbeing of P.Q. while they were supervising his home, thereby proximately causing him substantial and unnecessary physical and emotional harm and ultimately death.

104.    By virtue of the foregoing, defendants deprived P.Q. of rights protected by the Fourteenth Amendment to the United States Constitution.

13

105.    P.Q.'s substantive due process rights were clearly established constitutional rights at the time of Defendants' acts and omissions, and a reasonable individual would have known that their acts and omissions would violate these clearly established constitutional rights.

### THIRD CAUSE OF ACTION
(42 U.S.C. § 1983)
(Deliberate Indifference against all Defendants)

106.    Plaintiff repeats and realleges the foregoing.

107.    The infant plaintiff had a constitutional right to be free from unjustified intrusions on his personal security, in the form of physical and psychological abuse, while in government custody.

108.    The infant plaintiff had a constitutional right to be protected from physical and psychological injury while in government custody.

109.    In improperly investigating Madeline's home, ignoring Madeline and Fernando's history, placing infant plaintiff in Madeline's home, failing to supervise the infant in Madeline's home, and failing to protect the infant plaintiff from abuse, defendants were deliberately indifferent to the infant plaintiff's health and safety and to a serious and immediate risk of harm to the infant plaintiff, failed to exercise acceptable professional judgment and instead departed extremely from the exercise of acceptable professional judgment, and abused their power as ACS officials and employees.

110.    Defendants knew or should have known that there was a serious risk of child abuse in Madeline's home, and that the lack of adequate supervision and oversight caused constitutional violations.  Specifically, defendants had a practice of failing to investigate prospective foster parents adequately, failing to supervise children adequately, and failing to protect children in their care from harm because Defendants knew or should have known that:

14

      a.   Madeline had a history of inadequate guardianship and failure to protect children from extreme abuse.

      b.   Fernando was violent and sadistic and should not have been the caretaker of any child.

111.    Public reports documenting these deficiencies have been authored by the New York City Office of the Public Advocate, the Child Fatality Review Panel, and several other public agencies and officials.  These reports documented the systemic failure of defendants and their contract agencies to properly investigate all adults residing in foster homes; place children with appropriate foster caregivers; coordinate medical services for children in foster care; and ensure safe foster homes.

      a.   that similar civil rights actions have been brought against defendants City, for abuse sustained in foster care settings prior to the abuse inflicted on infant plaintiff described above.

      b.   that numerous complaints and substantiated reports of abuse of children placed in foster care homes within New York City.

112.    The City, ACS and Commissioner Defendants knew or should have known of the need to redress these ongoing constitutional violations, and had the authority to ameliorate them, but refused to exercise their authority, and refused to ensure compliance with the law

110.    Instead, defendants City, ACS and the Commissioner Defendants:

      a.   Maintained a policy of deliberate indifference to the type of care that children received in foster homes;

      b.   Improperly instructed their employees regarding NYCSS/ACS's obligation to supervise children or insure the children's safety after those employees removed the children

15

from their own homes;

    c.   Failed to develop or implement programs to ensure that child protective employees provided proper supervision for children placed by ACS;

    d.   Failed to develop or promulgate guidelines and procedures for the selection and supervision of parents, sufficient to eliminate or exclude those who pose a danger to children's welfare or who neglect or abuse children;

    e.   Failed to develop or implement procedures or standards for the protection of children in ACS monitored homes;

113.    Upon information and belief, the failure of the City, ACS and the Commissioner Defendants to supervise the ACS monitored homes, as described in the preceding paragraphs, was so widespread as to demonstrate a deliberate indifference to the needs of children placed in foster care that constituted a municipally sanctioned custom or policy.

114.    The City, ACS and Commissioner Defendants knew or should have known that a failure to act to remedy the inadequate oversight of New York City's ACS would lead to violations of the constitutional rights of children in foster care.

As a result of the foregoing, infant plaintiff suffered severe pain and suffering, terror, mental anguish, anxiety, and extraordinary physical and mental injuries, and death.

## FOURTH CAUSE OF ACTION
### (42 U.S.C. § 1983)
### (Acquiescence to Excessive Force- Against all Defendants)

115.    Plaintiff repeats and re-alleges the foregoing.

116.    In failing to protect the infant plaintiff from the abuse inflicted upon him, defendants acquiesced in the use of excessive force against the infant plaintiff, in violation of the Fourth and Fourteenth Amendments to the United States Constitution.

117.    As a result of the failures of the aforementioned defendants, the infant plaintiff was subjected to physical and psychological abuse.

118.    By reason of their acts and omissions, The City, ACS, Commissioner Defendants, Supervisor Defendants and Caseworker Defendants, acting under color of state law, in gross and wanton disregard of the infant plaintiff's rights, deprived the infant plaintiff of his liberty and privacy and of his right to be free from excessive force, in violation of the Fourth and Fourteenth Amendments to the United States Constitution, and knowingly acquiesced in the use of excessive force against the infant plaintiff.

119.    By reason of the foregoing, the infant plaintiff suffered severe pain and suffering, terror, mental anguish, anxiety and extraordinary physical and mental injuries; and ultimately death.

## FIFTH CAUSE OF ACTION
### (FAILURE TO TRAIN –
### AGAINST CITY, ACS, COMMISSIONER AND SUPERVISORY DEFENDANTS)

120.    Plaintiff repeats and re-alleges the foregoing.

121.    Defendants City, ACS, Commissioner and Supervisor Defendants, had an obligation to provide training to their caseworkers regarding:

    a.    the investigation of prospective homes where children under ACS supervision were placed;

    b.    the selection of proper ACS selected parents for particular children;

    c.    the supervision of children placed in ACS care; and

    d.    the protection of ACS placed children from abuse.

122.    Defendants City, ACS, Commissioner and Supervisor Defendants, were deliberately indifferent to their obligation to provide training to their employees on the subjects

listed in the previous paragraph.

123.   Defendants knew or should have known that their failure to provide such training would create risks to the safety of children in ACS care.

124.   In failing to provide adequate training to their employees, defendants were deliberately indifferent to the welfare of children in their custody and to the risk of injury to those children.

125.   As a result of the failures of the aforementioned defendants, the infant plaintiff was severely abused and ultimately killed.

126.    By reason of their acts and omissions, defendants acting under the color of state law, in gross and wanton disregard of the infant plaintiff's rights, deprived the infant plaintiff of her liberty and privacy and of her right to be free from unjustified intrusions on his personal security, in violation of the Fourteenth Amendment to the United States Constitution.

127.   By reason of the aforementioned, infant plaintiff suffered severe pain and suffering, terror, mental anguish, anxiety, and extraordinary physical and mental injuries, and death.

### SIXTH CAUSE OF ACTION
(WRONGFUL DEATH – ON BEHALF OF THE ESTATE OF P.Q. AND BENJAMIN QUINONES AND ASHLEY RAMIREZ INDIVIDUALLY - AGAINST ALL DEFENDANTS)

128.   Plaintiff repeats and realleges the foregoing.

129.   By reason of each of the foregoing actions committed by Defendants, P.Q. suffered severe conscious pain and suffering.

130.   By reason of the foregoing actions by Defendants, P.Q. died and his statutory distributes were deprived of his future earning and services and sustained pecuniary and non-economic loss resulting from the loss of P.Q.'s love, comfort, society, attention, support, and life.

131.    On March 17, 2015, the Bronx County Surrogate's Court issued limited letters of administration appointing Benjamin Quinones and Ashley Ramirez, co-administrators for P.Q.'s estate for the purpose of prosecuting the instant claims against defendants.

132.    As a result of the failures of the aforementioned defendants, plaintiff hereby claims damages for the wrongful death and conscience pain and suffering of P.Q. on behalf of his estate in an amount to be determined at trial.

133.    By virtue of the foregoing, Plaintiffs, individually and on behalf of P.Q.'s estate hereby claims damages in an amount to be determined at trial.

**WHEREFORE**, plaintiff respectfully requests that judgment be entered:

1. Awarding plaintiff full and fair damages, including punitive damages, in an amount to be determined by the jury;

3. Awarding plaintiff reasonable attorney fees pursuant to 42 U.S.C. §1988; and

4. Granting such other and further relief as this Court may deem just and proper.


Dated: New York, New York
       July 10, 2015

　　　　　　　　　　　　　　　　　/ss/
　　　　　　　　　　　　　　　　Robert Marinelli
　　　　　　　　　　　　　　　　305 Broadway, 9th Floor
　　　　　　　　　　　　　　　　New York, New York 10007
　　　　　　　　　　　　　　　　(212) 822-1427
　　　　　　　　　　　　　　　　robmarinelli@gmail.com

　　　　　　　　　　　　　　　　*Attorney for Co-Administrator Benjamin Quinones*



　　　　　　　　　　　　　　　　/ss/
　　　　　　　　　　　　　　　　Abraham George
　　　　　　　　　　　　　　　　44 Wall Street, 2nd Floor
　　　　　　　　　　　　　　　　New Yotk, New York 10005
　　　　　　　　　　　　　　　　(212) 822-1427
　　　　　　　　　　　　　　　　abe@abegeorge.lawyer

　　　　　　　　　　　　　　　　*Attorney for Co-Administrator Ashley Ramirez*